UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TRACY EDDINGTON,

       Plaintiff,                           Case No. 13–11947
                                          Honorable Thomas L. Ludington

v.

WAL-MART STORES
EAST, L.P.,

       Defendant.
_____/

**OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tracy Eddington (Eddington) brought this action against Wal-Mart Stores East, L.P. (Wal-Mart), alleging that Wal-Mart discriminated against her because of her race and retaliated against her because she complained about a racist customer. On May 19, 2014, Wal-Mart moved for summary judgment, arguing that Eddington could not demonstrate a prima facie case of racial discrimination or retaliation. Further, Wal-Mart argues that it had legitimate reasons for terminating Eddington's employment and that she cannot demonstrate these proffered reasons are merely pretext for discrimination. Wal-Mart is correct on both counts. Accordingly, Wal-Mart's motion for summary judgment will be granted and Eddington's complaint will be dismissed.

I

On August 5, 2005, Wal-Mart hired Eddington, an African American, as a part–time cashier at Wal-Mart Store #5097 in Saginaw, Michigan. As a cashier, Eddington was periodically assigned to the self–scan area, where she would stand at the cashier podium to deter

theft and serve as a direct point of contact for customers. The self–scan area contains signage indicating that there is a 20–item limit for those lanes.

On February 22, 2011, Eddington was working the self–scan cashier podium. A Caucasian customer approached a self–scan lane with what appeared to be more than 20 items in her cart. Eddington walked over, pointed to the 20–item limit sign, told the customer that the lane was reserved for customers with 20 items or less, and directed the customer to one of the attended registers for check out. The customer did not respond well to Eddington's suggestion and raised her voice while continuing to scan her items. Eddington then returned to her podium. The customer quipped, "if it helps you, I'll ring them up as two separate orders." Eddington Dep. 127–31, *attached as* Def.'s Mot. Ex. A. Eddington noted that the customer appeared agitated and spoke loudly to a companion that Eddington was trying to keep her from using the self–scan lanes. *Id.* at 130.

When the customer finished scanning her items, she approached Eddington and confronted her, accusing Eddington of shaking her head in a condescending manner; Eddington denies that she was shaking her head. *Id.* at 131–32. Then, according to Eddington, the customer told her, "If I were black, you wouldn't have said anything to me." *Id.*; *see also* Eddington Statement 1–2, *attached as* Def.'s Mot. Ex. I. Eddington replied that she was just doing her job and that company policy limited the self–scan lanes to customers with 20 items or less. Eddington Dep. 133. According to Eddington, the customer said, "Niggers. I want to see a manager." *Id.* Eddington then directed the customer to a manager but did not follow her. *Id.*

Wal-Mart Customer Relations Policy directs associates dealing with an angry customer to do just what Eddington did up to this point. Associates are directed to "[not] interrupt – never challenge a point or an inconsistency," "[b]e polite and show concern," "[don't] take things

personally" and, most importantly, if the complaint can't be resolved, "ask for help from the CSM." Customer Relations Policy 2, *attached as* Def.'s Mot., Ex. C.

While the customer was speaking with Customer Service Manager (CSM) Justin Lamb, Eddington overheard her saying that Eddington was "rude" and "insubordinat[e]." So despite Wal-Mart's Customer Relations Policy, Eddington walked to the customer service area in order to dispute the customer's explanation. Eddington Dep. 137–39. Interrupting the conversation between CSM Lamb and the customer, Eddington said to the customer, "get out of here with those lies." *Id.*; Lamb Dep. 12–13, *attached as* Def.'s Mot. Ex. J; Lamb Statement 1, *attached as* Def.'s Mot., Ex. K.

The confrontation was witnessed by another CSM on location, Diana Dominguez—a Wal-Mart employee of ten years and a CSM at Store #5097 for six. Dominguez indicated the confrontation between Eddington and the disgruntled customer lasted for several minutes, in view of other customers, until another employee was able to separate Eddington from the customer and the customer left the store momentarily. Dominguez Declaration 2, *attached as* Def.'s Mot. Ex. L. Dominguez characterized Eddington's behavior as the most aggressive and rude she has ever witnessed of a Wal-Mart employee. *Id.*

Following a meeting between management and Eddington, CSM Lamb spoke with the angry customer, apologized, and gave the customer a gift card.[1] Eddington then went to the employee break room where she was outwardly upset about the incident. She was alleged to have complained that management does "not stand behind associates" and "always takes the customer's side." Schindler Statement, *attached as* Def.'s Mot. Ex. P. Management

---

[1] Eddington is the only witness who alleges that a gift card was given to the customer. Wal-Mart denies that a gift card was issued; its Cash Fund Transfer Log, which tracks the issue of gift cards, shows that the only customer satisfaction gift card issued that day was for "a problem a customer had with ink." *See* Wal-Mart Response to Plaintiff's Request for Admissions, *attached as* Def.'s Mot. Ex. R.

subsequently received complaints from other associates who were offended by language that Eddington was using in the break room. The associates submitted that Eddington was angry, loud, using profanity, and that she indicated "if anyone did not like her profanity, they could leave." Eddington Dep. 145–49; Schindler Statement; Roth Statement, *attached as* Def.'s Mot. Ex. Q. Specifically, witnesses noted that Eddington used the words "shit, damn, and [fuck]" while in the break room. Roth Statement; *see also* Schindler Statement. Eddington admitted that she was loud and used profanity in the break room, but attributed it to the fact that management was "reward[ing]" a racist customer instead of addressing that customer's use of a racial slur. Eddington Dep. 145–46.

Wal-Mart has established a Statement of Ethics to denote appropriate conduct for its employees and, alternatively, to encourage employees to speak up about any unjust conduct on its part. Wal-Mart Statement of Ethics 3, *attached as* Def.'s Mot. Ex. E. According to the policy, Wal-Mart "will not tolerate" inappropriate conduct, such as "inappropriate language, gestures, threats of violence, and physical violence." *Id.* at 11. Wal-Mart's Statement of Ethics, also establishes that "[a]ppropriate disciplinary action, up to and including termination, may be taken against any associate whose conduct violates this . . . Statement of Ethics, or applicable laws and regulations, including the Guiding Principles." *Id.* at 7.

On February 25, 2011, after reviewing the statements of those involved, Wal-Mart decided to terminate Eddington's employment. It cited the following justification: Eddington's gross misconduct in treatment of a customer and intolerable language used in front of associates. Exit Interview Form, *attached as* Def.'s Mot. Ex. S. Wal-Mart noted that such conduct runs counter to its customer relations policy, Statement of Ethics, and Eddington's behavior training. *See*, *e.g.*, Wal-Mart Statement of Ethics. The panel members reviewing the incident testified that

they thought it was reasonable for Eddington to be upset, given the circumstances, but all agreed that her subsequent conduct was unjustified. Mitchell Dep. 43, *attached as* Def.'s Mot. Ex. D; Morris Dep. 36, *attached as* Def.'s Mot. Ex. F.

On May 1, 2013, Eddington filed this lawsuit against Wal-Mart, asserting discrimination and retaliation claims under the Civil Rights Act of 1964, Michigan's Elliott Larsen Civil Rights Act, 42 U.S.C. § 1981, and the Family Medical Leave Act.[2] *See* Pl.'s Compl., ECF No. 1. She seeks lost wages, compensatory damages, liquidated damages, punitive damages, and attorneys' fees.

Wal-Mart filed a motion for summary judgment on May 19, 2014, arguing that Eddington cannot demonstrate the necessary elements to establish her claims for race discrimination and retaliation. *See* Def.'s Mot., ECF No. 21. Moreover, Wal-Mart alleges that it had legitimate, non–discriminatory and non–retaliatory reasons for terminating Eddington's employment.

Eddington filed a response to Wal-Mart's motion on June 9, 2014, claiming that she has sufficient evidence to go to trial because she can show that 19 Caucasian employees at Wal-Mart's Saginaw location were not terminated despite displaying conduct similar to her own. *See* Chart of Disciplines, *attached as* Pl.'s Resp. Ex. 13. Eddington argues that this evidence demonstrates Wal-Mart's decision to fire her was not justified.

**II**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he party moving for summary judgment bears the initial burden of pointing

---

[2] Eddington's FMLA claim was subsequently dismissed pursuant to the parties' consent. *See* Jan. 23, 2014 Stip. Order, ECF No. 16.

out to the district court that there is an absence of evidence to support the non–moving party's case, but need not support its motion with affidavits or other materials 'negating' the opponent's claim." *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 339 (6th Cir. 1993); *see also Theus v. GlaxoSmithKline*, 452 F. App'x 596, 597 (6th Cir. 2011); *Adock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir. 1987). Upon making this showing, the burden shifts to the non–moving party to go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). All inferences must be drawn in the non–moving party's favor, *Lasher v. City of Kalamazoo*, 747 F.3d 714, 726 (6th Cir. 2014), but the non–moving party must show more than a mere scintilla of evidence to survive. *See Anderson v. Liberty Lobby, Inc*. 447 U.S. 242, 252 (1986).

## III

Eddington brings her claims (both retaliation and discrimination) under three statutes: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Michigan's Elliott Larsen Civil Rights Act. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because [of his race]." 42 U.S.C. § 2000e–2(a)(1). Likewise, § 1981 guarantees that "[a]ll persons within jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. Similarly, § 202 of the Elliott Larsen Act provides that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to the employment compensation, or a term, condition or privileges based on [race]." Mich. Comp. Laws § 37.37.2002(1)(a). Because the same Title VII standard applies to discrimination and

retaliation claims under Elliott Larsen and § 1981, all of Eddington's claims will be analyzed together. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the Elliot[t] Larsen Act under the same standards as claims of race discrimination brought under Title VII."); *Bobo v. UPS*, 665 F.3d 741, 756 (6th Cir. 2012) ("We review Title VII and § 1981 [retaliation] claims under the same standard."); *Trujillo v. Henniges Auto. Sealing. Sys. N. Am.*, No. 13–1376, 2014 WL 593782 at *3 n.2 (6th Cir. Feb. 18, 2014) (Elliott Larsen retaliation claims are "analyzed under standards similar to those for claims under Title VII.").

### A

In conjunction with Eddington's allegations that her termination was discriminatory, she contends that Wal-Mart retaliated against her for opposing the way it addressed the racial slur used by the customer. Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII. *See* 42 U.S.C. § 2000e–3(a). The Equal Employment Opportunity Commission (EEOC) has identified examples of "opposing" conduct that are protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices, or opposing unlawful acts by persons other than the employer—e.g., former employers, unions, and co–workers. *Johnson v. University of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (citing *EEOC Compliance Manual*, (CCH) ¶ 8006). The Supreme Court has directed that the EEOC's interpretation of Title VII be given "great deference" by the courts. *See Johnson*, 215 F.3d at 579 n.8.

Eddington attempts to proceed with her retaliation claims under both single–motive and mixed–motive analysis. Single–motive claims involve situations "where an illegitimate reason

motivated an employment decision," while mixed–motive claims involved circumstances "where both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Heathcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).

**1**

Under the single–motive theory, Eddington must narrow the actual reasons for her adverse employment action and demonstrate that it was Wal-Mart's discriminatory animus, and not some legitimate business concern, that prompted her termination. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 720 (6th Cir. 2006). Eddington offers no direct evidence of discrimination, and so this claim is analyzed under the burden–shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and later modified in *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). Under this framework: (1) the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence; (2) if the plaintiff succeeds, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action; and (3) should the defendant carry that burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons, but were pretext for retaliation. *Burdine*, 450 U.S. at 248. However, regardless of the burden–shifting nature of the analysis, Eddington retains the ultimate burden of persuasion that she is the victim of intentional race discrimination. *Id.* at 256.

**i**

To demonstrate a prima facie case of race retaliation, Eddington must show that (1) she engaged in a protected activity; (2) Wal-Mart knew about this activity; (3) Wal-Mart took an employment action adverse to Eddington; and (4) there was a causal connection between the

protected activity and the adverse employment action. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). Wal-Mart does not dispute that Eddington's report to management about the customer's use of a racial slur, or her communications revealing dissatisfaction with management's response to that customer, are protected activities. Additionally, Wal-Mart subsequently terminated Eddington's employment, which constitutes an adverse employment action. So the only dispute is whether Eddington has established the fourth element of her retaliation claim, a causal connection between her reports to management on February 22, 2011 (concerning the customer's use of the racial slur and management's response), and her later termination on February 25, 2011.

Eddington posits three theories to demonstrate this requisite causal connection: (1) the termination document lists her protected activity (complaining about the racial slur in front of the customer and in front of other employees) as a reason for her termination; (2) the fact that "similarly situated" employees were treated differently; and (3) the jury could infer a nefarious, retaliatory connection from the manner in which Wal-Mart disciplined another African–American employee who raised concerns about discrimination.

Eddington's assertion that the termination documents list her report of the customer's use of a racial slur as a reason for termination is inaccurate. The termination document did not provide that Eddington's employment was terminated because of her protected activity. Instead, Wal-Mart's Exit Interview Form indicates that Eddington was terminated for "Gross Misconduct" and her "Treatment of [a] customer and language used in front of associates." *See* Exit Interview Form. Eddington's protected activities are not referenced in the Exit Interview Form.

Concerning Eddington's second argument, when determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action. *Barrett v. Whirlpool Corp.* 556 F.3d 502, 516–17 (6th Cir. 2009); *see also Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) ("Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation."). Of course, temporal proximity between the protected activity and the adverse employment action is insufficient to establish discrimination unless it is coupled with "other incidia of retaliatory conduct." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

Eddington alleges that a number of Caucasian Wal-Mart employees acted just as she did (i.e. complaining in the break room, using profanity about a manager or on the sales floor, and making negative comments to customers), but unlike her, they were not fired. *See* Discipline Form, *attached as* Pl.'s Resp. Ex. 12; Chart of Disciplines. According to Eddington, these "facts" establish a prima facie case that Caucasian employees, who behaved the same way she did, received more lenient treatment. However, when confronted with a Rule 56 motion, mere allegations regarding other employees' misconduct do not satisfy the requirement of demonstrating a genuine issue of material fact. Indeed, in order to make a comparison between a plaintiff's treatment and that of non–minority employees, the plaintiff must show that the "comparables" are similarly–situated *in all material respects*. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citing *Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.

1988)).  Thus, to be "similarly–situated," the individuals with whom Eddington seeks to compare her treatment must have the same supervisor(s), have been subject to the same standards, and have engaged in the same conduct—without such differentiating or mitigating circumstances to distinguish their conduct or Wal-Mart's resulting treatment.  *Id.*  (citations omitted).

But Eddington does not attempt to explain how the numerous Caucasian employees she identifies in Exhibit 13 were "similarly situated in all respects."  She did not show what role those employees performed at Wal-Mart, or that they were terminated by the same manager.  She also does not explain how their conduct compared to hers.  In fact, Eddington does not identify one instance involving an employee aggressively confronting a customer who is already speaking with management.  Eddington does not identify one instance where a Wal-Mart employee had to be physically separated from a customer by other associates.  She does not identify any situation where an employee's confrontation with a customer was coupled with co-employee complaints concerning inappropriate language and behavior.  In short, Eddington has not raised a legitimate factual assertion indicating that she was terminated because of her protected activity; she has not demonstrated that she was treated differently than other "similarly–situated" employees.

This conclusion is buttressed by the testimony of Diana Dominguez, the CSM who overheard and witnessed Eddington's confrontation.  In all of Dominguez's years of experience she has never seen a Wal-Mart associate behave as aggressively or as rudely as Eddington did on February 22, 2011.  *See* Dominguez Decl.  For Dominguez, Eddington's conduct was unprecedented.

With her final argument concerning causation, Eddington argues that Wal-Mart retaliated against another African–American employee who complained about racism, and therefore that is

what happened here. But to establish causation, Eddington must "proffer evidence sufficient to raise the inference that *her protected activity* was the likely reason for the adverse action." *Upshow v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (emphasis added) (internal quotation marks and citation omitted).

In *EEOC v. Avery Dennison Corp.*, the Sixth Circuit determined that the burden of establishing a prima facie case of retaliation is easily met; it only requires a plaintiff to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. 104 F.3d 858, 861 (6th Cir. 1997). Despite the low threshold, Eddington has not presented sufficient evidence to draw the inference that her employment was terminated because of her report of a customer's use of a racial slur, or because of her dissatisfaction with management's response. Thus, she has not met her burden of establishing a prima face case of retaliation.

### ii

Even if Eddington could satisfy her prima facie burden, she cannot overcome Wal-Mart's legitimate, nondiscriminatory reason for her termination. As noted above, if a prima facie case for retaliation is demonstrated, the burden shifts to Wal-Mart to establish a "legitimate, nondiscriminatory reason" for Eddington's discharge. *Johnson*, 215 F.3d at 579. Here, Wal-Mart has articulated legitimate nondiscriminatory reasons for Eddington's termination.

Wal-Mart submits that Eddington's termination was caused by the combination of her direct, aggressive confrontation with a customer and her subsequent language and conduct in the break room. Eddington concedes as much in her response to Wal-Mart's motion for summary judgment, positing that Wal-Mart's burden is "merely to articulate a reason. It has met its

burden." Pl.'s Resp. 15. Accordingly, Wal-Mart has provided a legitimate, nondiscriminatory reason for its adverse employment action.

### iii

And even if the analysis should proceed to the third step, where the burden shifts back to Eddington to demonstrate that the proffered reason was not the true reason for the adverse employment action, Eddington must show that the reason was mere pretext for retaliation. *See Johnson*, 215 F.3d at 578–79. This is a burden that she cannot carry. To meet her burden on pretext, Eddington must produce sufficient evidence for a reasonable fact–finder to reject Wal-Mart's proffered reason. *Haughton v. Orchid Automation*, 206 F. App'x 524, 531 (6th Cir. 2006). Eddington can demonstrate pretext by showing that Wal-Mart's proffered reason (1) has no basis in fact, (2) did not actually motivate its challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002) (quotation omitted).

Eddington does not allege that Wal-Mart's proffered reason has no basis in fact; she confirmed that it did in her deposition. *See* Eddington Dep. 126–32. Nor does she allege that Wal-Mart's proffered reason did not actually motivate the challenged conduct. Instead, the main crux of her argument is that the reason given by Wal-Mart for her termination did not justify that termination. In support of that contention, Eddington returns to the exhibit showing a number of Caucasian employees that were disciplined with a warning—and sometimes multiple warnings—instead of permanent termination for violations of Wal-Mart policy that she claims were similar to her own. *See* Discipline Form. The Supreme Court has found evidence where "white employees involved in acts . . . of comparable seriousness . . . were nevertheless retained" especially relevant for a showing of pretext. *McDonnell Douglas*, 411 U.S. at 804. However, in

order to compare Eddington's treatment to that of non–minority employees, she must show that the "comparables" are similarly–situated *in all material respects*. As mentioned previously, Eddington has not demonstrated that her circumstances and her conduct were similar to that of the Caucasian employees she identifies.

Other evidence that may be relevant to pretext includes the employer's general policy and practice with respect to minority employment, which may demonstrate a "general pattern of discrimination against blacks." *Id.* at 805. Between 2009 and 2013, Wal-Mart explains that it disciplined or terminated 54 other associates at store #5097 for either poor customer service, violations of the "Respect for the Individual" core belief, inappropriate behavior, and/or profanity. *See* Def.'s Resp. to First Interrogatories 6, *attached as* Def.'s Mot. Ex. U; *see* Pl.'s First Interrogatory 2–4, *attached as* Def.'s Mot. Ex. V. Of those disciplined or terminated, 36 were Caucasian, 15 were African American, and 3 were Hispanic. *See* Pl.'s First Interrogatory 2–4; List of Disciplined or Terminated employees. Nine cashiers of various races have been subject to termination of employment, including some for gross misconduct—just like Eddington. List of Employment Terminations, *attached as* Def.'s Mot. Ex. Y. This evidence does not reflect any pattern of discrimination.

More than just employment statistics relating to discipline, Wal-Mart offers evidence that employees who complain about a customer's treatment are not singled out for termination. It emphasizes the testimony from Janet Morris, also an African–American Wal-Mart employee working at store #5097, who exchanged loud, angry comments with a white customer about a return the customer was attempting to make without a receipt. Morris Dep. 31–38, *attached as* Def.'s Mot. Ex. F. During that exchange, the customer called Ms. Morris a "prejudice[d] black nigger." *Id.* at 32–33. Like the situation here, Ms. Morris reported the customer's conduct, and

- 14 -

Wal-Mart management intervened, asking Ms. Morris to step away and eventually allowing the customer to make the return. *Id.* at 33–34. There was no disciplinary action taken against Ms. Morris for making the report. *Id.* at 37. Instead, Ms. Morris testified that management handled her situation appropriately. *Id.* at 38–39. Because she adhered to Wal-Mart's Customer Service Policy, no further action was taken.

Wal-Mart has shown, through statistics and policy that it has consistently handled discipline with employees of various races. Other African–American Wal-Mart employees— employees subjected to similar racial abuse by customers—were able to report the situation without incident or reprimand. Eddington has not demonstrated that the reason proffered by Wal-Mart for her termination was merely a pretext for retaliation.

**2**

Eddington also attempts to pursue her retaliation claims under a mixed–motive theory, where she need only demonstrate that Wal-Mart was partially motivated by illegitimate reasons. *See White*, 533 F.3d at 396. But, as Wal-Mart correctly notes in its reply brief, the Supreme Court recently concluded that mixed–motive analysis is not applicable to Title VII retaliation claims. Instead, a plaintiff must demonstrate the protected activity was the "but–for" cause of termination. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). In *Nassar*, the Supreme Court expressly abrogated many of the cases that Eddington relies upon for the application of the mixed–motive analysis to her Title VII retaliation claim. *Id.* at 2528–32. Accordingly, to succeed on those claims, Eddington must demonstrate her protected activity was the "but–for" cause of her termination. *See Id.* at 1532 ("Title VII retaliation claims must be proved according to traditional principles of but–for causation").

But–for causation requires proof that the alleged adverse action of the employer would not have occurred in the absence of the employee's protected activity. *Id.* at 2534. Thus, for Eddington's retaliation claim to succeed, she must demonstrate that she would not have been terminated—regardless of her subsequent conduct—if she had not reported the customer's use of a racial slur. However, Wal-Mart has demonstrated that Eddington's subsequent conduct, including aggressively confronting a customer and later using offensive language in the break room, was sufficient to terminate her employment.

Eddington has admitted to conduct that violates Wal-Mart's Statement of Ethics, including the Guiding Principles. *See* Eddington Dep. 134–41, 146–52. Wal-Mart has advanced evidence demonstrating that numerous other employees have been terminated for violating these rules. *See* List of Disciplined or Terminated Employees. So, Eddington has not demonstrated that her protected activity was the "but–for" cause of her termination, and her retaliation claims are without merit.

**B**

Eddington also alleges that Wal-Mart discriminated against her because of her race. Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Elliot Larsen and § 1981 forbid similar conduct. As noted above, discrimination claims under Title VII, § 1981, and Elliott Larsen can be analyzed under Title VII standards. *See Jackson*, 191 F.3d at 658.

To withstand summary judgment on her discrimination claims, Eddington must either "present direct evidence of discrimination or introduce circumstantial evidence that would allow

an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). In the absence of direct evidence, Eddington can establish an inferential case of discrimination under the *McDonnell Douglas* framework. As with her retaliation claims, Eddington attempts to proceed under both the single–motive and mixed motive theories of liability; each will be considered in turn.

**1**

Again, Eddington offers no direct evidence of discrimination, so her discrimination claims will be analyzed under the burden–shifting framework set forth in *McDonnell Douglas*. As before, regardless of the burden–shifting analysis, Eddington retains the ultimate burden of persuasion to demonstrate intentional discrimination. *Id.* at 256.

To establish a prima facie case of discrimination with circumstantial evidence under the single–motive analysis, Eddington must demonstrate that (1) she is a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly–situated, non–protected employees. *Wright*, 455 F.3d at 707. It is undisputed that Eddington meets the first three elements of the prima facie case: she is African American; she was terminated; and she was qualified for the position she held. Accordingly, the focus here is whether Eddington was treated differently than other non–protected employees of similar qualifications.[3]

Eddington argues that she was treated differently than similarly–situated, Caucasian employees. But again, as emphasized above, the Sixth Circuit requires a plaintiff to show that her "comparables" are similarly–situated *in all material respects*. *Mitchell*, 964 F.2d at 583 (citing *Stotts*, 858 F.2d at 289). Thus, to be "similarly–situated," the individuals with whom Eddington seeks to compare herself to must have dealt with the same supervisor, have been

---

[3] Eddington does not argue that she was replaced by someone outside of her protected class.

subject to the same standards, and have engaged in the same conduct—without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mitchell*, 964 F.2d at 583 (citations omitted).

Eddington has not demonstrated that she is "similarly–situated in all respects" to the non–protected employees she advances. In all the materials she presents, Eddington does not present one non–protected employee who engaged in similar misconduct but was not terminated. Indeed, Wal-Mart presents evidence from CSM Dominguez, who described Eddington's conduct as the most aggressive that she has observed in her ten–year career. *See* Dominguez Decl. Accordingly, Eddington's evidence amounts to a comparison of apples and oranges; she has not proven she is similarly–situated to non–protected employees who retained employment. She has not met her burden of establishing a prima facie case of discrimination, and these claims are without merit. Moreover, as with her retaliation claims, even if Eddington could satisfy her prima facie burden, she cannot overcome Wal-Mart's legitimate, nondiscriminatory reason for her termination.

Because a legitimate, nondiscriminatory reason was advanced by Wal-Mart, the burden shifts back to Eddington to demonstrate that the proffered reason was merely pretext for discrimination. *See Johnson*, 215 F.3d at 578–79. Once again, Eddington cannot carry this burden. Pretext requires sufficient evidence allowing a reasonable fact–finder to reject Wal-Mart's proffered reason for Eddington's termination. Her only proof of pretext is contained in an exhibit showing a number of Caucasian employees that were disciplined with a warning—and sometimes multiple warnings—instead of permanent termination, for what she claims were similar violations of Wal-Mart policy. *See* Discipline Form. Again, Eddington has not demonstrated that these employees are similarly–situated *in all material respects* to enable a

meaningful comparison. Accordingly, Eddington has failed to show that the reason proffered by Wal-Mart for her termination was merely pretext for discrimination.

**2**

Unlike retaliation cases, in order to defeat summary judgment on a discrimination claim under a mixed–motive analysis, Eddington must produce evidence sufficient to convince a jury that: (1) Wal-Mart "took an adverse employment action against her; and (2) race, color, religion, sex, or national origin was a motivating factor" for Wal-Mart's adverse employment action. *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (quoting *White*, 533 F.3d at 400). Evidence of discrimination can be direct or circumstantial. *Griffin*, 689 F.3d at 595. The burden for Eddington to produce evidence is not considered onerous and should preclude further consideration of the case when the record is devoid of evidence that could "reasonably be construed to support" her claim. *Anderson*, 477 U.S. at 252.

There can be no doubt that Wal-Mart took an adverse employment action; it terminated Eddington's employment. The central issue is again whether Eddington's race was a motivating factor for the termination. Eddington claims that she offers "considerable circumstantial evidence" of the disparate treatment between herself and other Caucasian employees who were disciplined, creating the inference of discrimination. However, Eddington's assertion that 19 Caucasian employees engaged in similar misconduct and were disciplined differently has not been demonstrated by any evidence.

Eddington has not presented sufficient evidence that Wal-Mart relied on unlawful motives in terminating her employment. Because Eddington has not established a genuine issue of material fact as to whether discrimination motivated her termination, her discrimination claims will be dismissed.

**IV**

Accordingly, it is **ORDERED** that Wal-Mart's motion for summary judgment, ECF No. 21, is **GRANTED**.

It is further **ORDERED** that Eddington's Complaint, ECF No. 1, is **DISMISSED** with prejudice.

Dated: July 16, 2014                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 16, 2014.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS